# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | : **CRIMINAL COMPLAINT** |
| v. | : Honorable Edward S. Kiel |
| JOEL TAYAG | : Mag. No. 20-15132 |

I, Jeremy Rodriguez, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the U.S. Drug Enforcement Administration, and that this complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Jeremy Rodriguez, Special Agent
Drug Enforcement Administration

Sworn to before me and subscribed in my presence,
March 12, 2020, Essex County, New Jersey

Honorable Edward S. Kiel                    _____
United States Magistrate Judge                    Signature of Judicial Officer

1

## ATTACHMENT A

### COUNT ONE
(Conspiracy to Distribute Methamphetamine)

Between on or about November 7, 2019, and on or around March 12, 2020, in the District of New Jersey and elsewhere, the defendant,

**JOEL TAYAG**,

did knowingly and intentionally conspire and agree with others to distribute 50 grams or more of a mixture and substance containing methamphetamine, a Schedule II controlled substance, contrary to Title 21, United States Code, Sections 841(a)(1) and (b)(1)(B).

In violation of Title 21, United States Code, Sections 846.

## ATTACHMENT B

I, Jeremy Rodriguez, am a Special Agent with the U.S. Drug Enforcement Administration (the "DEA"). I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and photographs of the evidence. Where statements of others are related herein, they are related in substance and part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

1. On or about November 7, 2019, law enforcement arranged for a confidential source with a history of reliability and creditability (the "CS") to purchase narcotics from an individual named Jerol Jalocon ("JALOCON"). In particular, JALOCON agreed to sell the CS approximately 2 ounces of methamphetamine, and instructed the CS to meet JALOCON at the residence of Joel Tayag ("TAYAG") in Little Ferry, New Jersey (the "TAYAG RESIDENCE") to execute the transaction.

2. On that same date, prior to the meeting, law enforcement provided the CS with approximately $2,400 in United States currency and an electronic recording device. Soon thereafter, the CS, at the direction and under the supervision of law enforcement, went to meet JALOCON at the TAYAG RESIDENCE. Law enforcement also set up surveillance near the TAYAG RESIDENCE.

3. Once the CS arrived at the TAYAG RESIDENCE, law enforcement observed Jalocon exit the TAYAG RESIDENCE, approach the car that the CS was in, and conduct a hand-to-hand narcotics transaction with the CS. Jalocon then reentered the TAYAG RESIDENCE and the CS left the area. Shortly thereafter, the CS handed law enforcement two clear small bags containing suspected methamphetamine.

4. Law enforcement field tested the substance, and it tested positive for the presence of methamphetamine, a Schedule II controlled substance. It weighed approximately 77.8 grams.

5. On or about November 27, 2019, law enforcement arranged for the CS to purchase narcotics directly from TAYAG. In particular, TAYAG agreed to sell the CS approximately 2 ounces of methamphetamine.

6. On that same date, prior to the meeting, law enforcement provided the CS with approximately $2,400 in United States currency and an electronic recording device. Soon thereafter, the CS, at the direction and under the supervision of law enforcement, went to meet TAYAG at the TAYAG RESIDENCE.

Law enforcement again set up surveillance in the area around the TAYAG RESIDENCE. Law enforcement observed the CS exit the TAYAG RESIDENCE with an unknown male (the "UM") and walk with the UM to another building in the area of the TAYAG RESIDENCE (the "LOCATION").

7. Upon exiting the LOCATION, the UM returned to the TAYAG RESIDENCE and the CS left the area. Shortly thereafter, the CS handed law enforcement two clear small bags containing suspected methamphetamine.

8. Law enforcement field tested the substance, and it tested positive for the presence of methamphetamine, a Schedule II controlled substance. It weighed approximately 80.4 grams.

9. The CS explained to law enforcement that, inside the TAYAG RESIDENCE, the CS met with TAYAG who instructed the CS to travel with the UM to the LOCATION to pick up the two ounces of methamphetamine. The CS further explained that TAYAG instructed the CS to provide the UM with $1,600 in exchange for the narcotics once the pick-up was complete. This interaction was also audio recorded. The CS informed law enforcement that he complied with those instructions, and provided the UM $1,600 in exchange for the methamphetamine on TAYAG's behalf.